IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VONSHEA C. BUTLER                    *

          Plaintiff        *

              vs.          *    CIVIL ACTION NO. MJG-11-2854

MARYLAND AVIATION ADMINISTRATION*

          Defendant        *

*       *       *       *       *       *       *       *       *

## MEMORANDUM AND ORDER RE: MOTION TO DISMISS

The Court has before it Defendant Maryland Aviation Administration's ("the MAA") (Amended) Motion to Dismiss Plaintiff's Complaint, or in the Alternative, for Summary Judgment [Document 19] and the materials submitted relating thereto.  The Court has held a hearing and had the benefit of the arguments of counsel.

I.   BACKGROUND

     A.   Alleged Facts[1]

Plaintiff Vonshea Butler ("Butler") was employed by the MAA from July 2006 until October 6, 2010.  During her employment, she was sexually harassed, at different times, by two different supervisors, both of whom had their employment terminated

---

[1]     The "facts" herein are as alleged by Plaintiff and are not necessarily agreed upon by Defendants.

following Butler's filing of sexual harassment complaints.
However, Butler alleges, she was subjected to a hostile work
environment and terminated in retaliation for her having
complained of the sexual harassment.

### 1.   Sheehan Matters

When hired by the MAA in 2006, she was assigned to work at
the Baltimore-Washington International Airport ("BWI") under the
supervision of Steven Sheehan ("Sheehan"). "Some time"
thereafter, Sheehan commenced engaging in "inappropriate and
bizarre conduct" such as "showing up at [Butler's] home
unannounced, at odd hours of the day and night, and would stand
outside her home."  Compl. ¶ 18.

Butler reported the harassment by Sheehan to the Airport's
Fair Practices Officer, Angela Martin ("Martin"), in August,
2007.  Martin conducted an investigation of the alleged
harassment and, in December 2007, concluded that Butler had not
been sexually harassed by Sheehan.  Compl. ¶ 21.  Nevertheless,
the MAA terminated Mr. Sheehan's employment.  Compl. ¶ 22.

### 2.   Samuels Matters

In September 2007, a month after Butler filed her internal
complaint against Sheehan, Butler was transferred to work under
a new supervisor, Claude Samuels ("Samuels").

Butler alleges that Samuels attempted to "exercise emotional control" over Butler by affirming rumors that "'the Administration'" wished to fire her in retaliation for her complaint against Sheehan, stating that Butler needed Samuels "'to protect her' because she was 'weak.'"  Compl. ¶¶ 27-29.

In March 2008, Samuels expressed an interest in seeing a puppy that Butler had obtained and was invited to her house. When in Butler's home, Samuels made "crude and sexually offensive remarks about the size of his penis."  Compl. ¶ 33. Butler then asked Samuels to leave her house and he did so.

Butler did not advise management about the specifics of Samuels' conduct.[2]  Instead, she made a general request for a transfer to another supervisor in March 2008, claiming she was "not getting along" with Samuels.  The request was not granted. Compl. ¶ 35.

Thereafter, Samuels' harassment of Butler escalated. According to Butler, Samuels' inappropriate conduct included, but was not limited to, calling her sexual names, graphically describing his sexual preferences to her, punching her in the

---

[2]     Butler states: "Given her legitimate concerns about retaliation from the Airport's senior management, Ms. Butler did not wish to raise a major issue with respect to Mr. Samuels' behavior.  Specifically, she did not want another investigation of a supervisor, and she did not want Mr. Samuels to face discipline since, among other things, she feared retaliation by the Defendant's management if she reported another incident of sexual harassment."  Compl. ¶ 34.

arms (sometimes leaving bruises), putting his finger in her vagina, making violent[3] and racial[4] threats and comments towards her, etc.

After a year of enduring this type of behavior, in March 2009, Butler attempted again to pursue her transfer request. She stated that she wished to have the matter handled discreetly without an investigation.  However, an internal investigation was conducted.  Compl. ¶¶ 53, 57, 60.  As a result of the investigation, in June 2009 Samuels' employment was terminated for "inappropriate, unprofessional behavior and poor judgment." Compl. ¶ 67.

### 3.   The Retaliation

In retaliation for Butler's having made sexual harassment complaints, the MAA allegedly took a "blame the victim" attitude and exhibited "hostility" toward Butler by forcing her to sign a "Counseling Memorandum" and denying her renewed transfer request.  Compl. ¶¶ 70-73.  The Counseling Memorandum, dated

---

[3]    Samuels threatened to "blow up her house and kill Ms. Butler, her daughter and her dog," and told her that "someone called 'the Butcher' would come and get her."  Compl. ¶ 44.

[4]    Specifically, Samuels allegedly told Butler that she was "trying to be white" by not having long pubic hair, and that "if a race war started," she "would be the first one killed" because she had once dated a white man.  Compl. ¶¶ 43, 44.

June 5, 2009, mandated that Butler refrain from a "laundry list" of conduct.  Compl. ¶ 70.

Butler became aware that the investigation had been "ham-fisted," and was essentially "[a] witch hunt that was largely designed to humiliate and intimidate [her] for raising a second sexual harassment complaint."  Compl. ¶ 75.  She concluded that the investigation "was not conducted in good faith" because a staff attorney had indiscreetly interviewed other employees, and had produced affidavits from employees that allowed employees who did not like Ms. Butler "to vent their grievances through the affidavits" and some contained "false and accusatory statements about Ms. Butler."  Compl. ¶¶ 76-77.

Upon returning to work, Butler experienced "palpable" tension in the office environment as a result of the investigation into Samuels.  Compl. ¶ 81.  After a few weeks, as a result of the investigation and the hostility it created, Butler felt "demeaned and humiliated" at work and began to experience "major bouts of depression," anxiety, and panic attacks.  Compl. ¶¶ 82, 85.

Butler's physician wrote to the MAA in July 2009, and requested she be reassigned to a different environment in order to ease her symptoms.  Butler reiterated the request through counsel, but it merely resulted in her being moved to a different building while still performing the same job with the

same coworkers.  Butler subsequently took three months' sick leave in October 2009, in order to attend therapy.

In November 2009, Butler consented to a medical review by the MDOT Medical Advisor, Robert Toney, M.D. ("Dr. Toney"). However, the MAA's H.R. Director Janine Ladzinski ("Ladzinski") made inappropriate comments[5] to Dr. Toney prior to the medical exam, thereby signaling to Dr. Toney the result she wished him to reach.  Dr. Toney's preliminary report stated that Butler suffered from Depression, PTSD, and Anxiety Disorder, and that she was "unable to return to work" at that time.  Compl. ¶ 99.

Dr. Toney referred Butler to Dr. Sheldon Levin ("Dr. Levin") for an Independent Psychological Investigation.  Dr. Levin's report stated:

> It is this evaluator's belief that Ms. Butler is experiencing a degree of depression and describes symptoms that are suggestive of P.T.S.D.  However, there is reason to believe that Ms. Butler may have not been an innocent victim but rather was suggestive in presentation and reinforcing of her Supervisors' sexual approaches.

Motion Ex. 17 at 16.  The report recommended that the MAA transfer Butler to a female supervisor, if possible, after an additional 1-2 months leave.  Id.

---

[5]   Ladzinski noted that Butler had acted in a "sexually provocative manner in the workplace" and had displayed "disruptive and inappropriate" behavior.  Compl. ¶ 94.

After receiving Dr. Levin's report, Dr. Toney rendered a second report on December 22, 2009.  In this report, he stated:

> It is my opinion that Ms. Butler is unable to return to work and perform the essential duties of her position at this time. . . . I do not feel that she will get to the point that she will be able to consistently and reliably return to her current agency.

Mot. Ex. 18 at 4.[6]

On May 17, 2010, Butler received an "options letter" which outlined four possible courses of action she could take with regard to her employment at the MAA:

1.   Apply for disability retirement,

2.   Apply to be placed on unpaid leave for medical reasons, which would allow her to keep her health insurance policy,

3.   Resign from her position based on her inability to return to her job, or

4.   Select options 1 and 2 concurrently.

Butler did not accept any of the options, instead requesting that the MAA allow her to remain on paid administrative leave while assisting her in finding alternative employment at another "modal agency."[7]  Her request was denied.

---

[6]   The Court notes that Butler's Complaint, which describes both doctors' opinions, appears to incorrectly attribute Dr. Levin's recommendations to Dr. Toney, who summarized Dr. Levin's recommendations within his report.  Compare Compl. ¶ 102 with Motion Ex. 17 at 16 and Mot. Ex. 18 at 4.

[7]   "Modal agency/administration" refers to "any of the following: (1) The State Aviation Administration; (2) The

On September 29, 2010, Butler was notified that her
employment would be terminated effective October 6, 2010.  Her
employment was, in fact, terminated on that date.


    B.   <u>Procedural Posture</u>

In the Complaint, Butler presents claims in three counts:

> Count One: Race and gender discrimination and
> hostile work environment in violation of Title
> VII of the Civil Rights Act of 1964;
>
> Count Two: Retaliation in violation of 42 U.S.C.
> § 2000e(3); and
>
> Count Three: Discrimination and hostile work
> environment in violation of Maryland Code Ann.,
> State Government, §§ 20-2601 <u>et seq.</u>

By the instant motion, the MAA seeks dismissal of all
claims.[8]


II.  <u>DISMISSAL STANDARD</u>

A motion to dismiss filed pursuant to Federal Rule of Civil
Procedure 12(b)(6) tests the legal sufficiency of a complaint.
A complaint need only contain "a short and plain statement of
the claim showing that the pleader is entitled to relief, in

---

Maryland Port Administration; (3) The Maryland Transit
Administration; (4) The State Highway Administration; or (5) The
Motor Vehicle Administration." Md. Code Ann., Transp. § 1-101.
[8]    The MAA entitles its motion as "Motion to Dismiss or
Alternatively Motion for Summary Judgment."  However, it
presents no reason why the Court should not deny the summary
judgment motion as premature.

order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff.  However, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id.  A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557).  A court is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

     Inquiry into whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.  Thus, if the well-pleaded facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. (quoting Iqbal, 556 U.S. at 679) (internal quotation marks omitted).

     Generally, a motion to dismiss filed under Rule 12(b)(6) cannot reach the merits of an affirmative defense.  Goodman v.

Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007).  It is possible to evaluate such a motion, however, if all the facts necessary to the affirmative defense are clearly alleged on the face of the complaint.  Id.  But if the complaint does not clearly reveal the existence of a meritorious affirmative defense, it is inappropriate for the court to consider it under a Rule 12(b)(6) motion.  Richmond, Fredericksburg & Potomac R.R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993).


III.  DISCUSSION

    A.   Count One - Title VII

    Title VII provides, in pertinent part:

> It shall be an unlawful employment practice
> for an employer—
>
> (1) to  * * * discriminate against any
> individual with respect to his compensation,
> terms, conditions, or privileges of
> employment, because of such individual's
> race, color, religion, sex, or national
> origin.

 42 U.S.C. § 2000e-2(a)(1).

    In Count One, Butler claims that she was subject to a hostile work environment[9] by virtue of her gender.[10]  To plead a

---

[9]    Butler may be contending that Count One of the Complaint includes a claim that her employment was terminated due to her race and/or gender.  If so, the contention would be baseless inasmuch as there are no facts alleged presenting any such claim as distinct from the retaliation claim presented in Count Two.

hostile work environment claim, Butler must alleged facts

rendering plausible four elements:

> (1) Unwelcome conduct;

> (2) Based on her sex;

> (3) Sufficiently severe or pervasive to
> alter the plaintiff's conditions of
> employment and to create an abusive work
> environment; and

> (4) Which is imputable to the employer.

Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir.

2010) (citation omitted).

The first three elements require little discussion. The

alleged actions of Sheehan and Samuels constituted unwelcome

conduct based upon Butler's sex.  Moreover, based on Butler's

specific factual allegations, there can be a plausible claim

that the conduct was sufficiently severe and persuasive as to

create an abusive work environment.[11] However, Butler has not

pleaded facts establishing a plausible claim that the hostile

work environment to which she was subject is imputable to her

employer, the MAA.

---

[10]   Butler also contends that she was subjected to race based
discrimination but has not presented factual allegations
supporting any plausible claim based upon her race.
[11]   [I]n order to be actionable under the statute, a sexually
objectionable environment must be both objectively and
subjectively offensive, one that a reasonable person would find
hostile or abusive, and one that the victim in fact did perceive
to be so.

Vicarious liability for the employer is appropriate where there is "actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently harassing action by subordinates, which the employer or its informed officers have done nothing to stop."  Faragher v. City of Boca Raton, 524 U.S. 775, 789 (1998).

As alleged in the Complaint, when the MAA management was made aware of the inappropriate conduct of Sheehan and Samuels, the MAA took action to stop the conduct.

It can be appropriate to impute a hostile work environment to an employer where "the individual charged with creating the abusive atmosphere was . . . indisputably within that class of an employer organization's officials who may be treated as the organization's proxy."  Id. at 789-90 (collecting cases for the proposition that harassment by "a proprietor, partner or corporate officer" can be imputed to the employer (quoting Katz v. Dole, 709 F.2d 251, 255 (4th Cir. 1983)).  However, the alleged facts do not present a plausible claim that either Sheehan or Samuels could be considered the employer's proxy.

 Finally, harassment can be imputed to the employer when a supervisor's harassment has culminated in a tangible employment action because in that scenario, "the agency relation aids in commission of supervisor harassment."  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 763 (1998).  "[A] tangible

12

employment action taken by the supervisor becomes for Title VII
purposes the act of the employer. . . .  In that instance, it
would be implausible to interpret agency principles to allow an
employer to escape liability." <u>Id.</u> at 762-63.  In the instant
case, the only alleged tangible employment action occurred in
October 2009 when Butler's employment was terminated.  That
action was, of course, taken by the MAA, but is the subject of
Count Two and addressed in regard to that Count.

The Court further notes that, even on Butler's factual
allegations, the MAA would be entitled to the "<u>Faragher</u>/<u>Ellerth</u>"
affirmative defense.  <u>Faragher v. City of Boca Raton</u>, 524 U.S.
775 (1998); <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742
(1998).

> To establish the defense, an employer must prove:
>
>> (a) that the employer exercised reasonable
>> care to prevent and correct promptly any
>> sexually harassing behavior, and
>>
>> (b) that the plaintiff employee unreasonably
>> failed to take advantage of any preventive
>> or corrective opportunities provided by the
>> employer or to avoid harm otherwise.

<u>Faragher</u>, 524 U.S. at 808; <u>Ellerth</u>, 524 U.S. at 765.

In determining whether an employer exercised reasonable
care to prevent and correct sexual harassment, the employer's
"adoption of an effective anti-harassment policy" is "an
important factor," <u>Smith v. First Union Nat. Bank</u>, 202 F.3d 234,

13

244 (4th Cir. 2000), however "the policy must be effective in
order to have meaningful value."  E.E.O.C. v. Sunbelt Rentals,
Inc., 521 F.3d 306, 320 (4th Cir. 2008).  "Evidence showing that
the employer implemented the policy in bad faith or was
deficient in enforcing the policy will rebut this proof."
Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 268 (4th
Cir. 2001).

As stated by the Fourth Circuit in Spicer v. Commonwealth
of Virginia, Department of Corrections, 66 F.3d 705 (4th Cir.
1995):

> When presented with the existence of illegal
> conduct, employers can be required to
> respond promptly and effectively, but when
> an employer's remedial response results in
> the cessation of the complained of conduct,
> liability must cease as well. Employers
> cannot be saddled with the insurmountable
> task of conforming all employee conduct at
> all times to the dictates of Title VII,
> irrespective of their knowledge of such
> conduct or the remedial measures taken in
> response to such conduct.

Id. at 711; see also E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 670
(4th Cir. 2011) ("'A remedial action that effectively stops the
harassment will be deemed adequate as a matter of law'" to
preclude an employer's liability (citation omitted)).

As reflected in the Complaint, the MAA took action to
correct promptly upon being advised of Sheehan's and Samuels'
sexually harassing behavior.  Indeed, as to Samuels' behavior,

the MAA acted proactively to initiate an investigation even before Butler wanted one to be conducted.

Butler unreasonably failed to utilize the mechanism the MAA had in place for reporting and investigating instances of harassment.

Butler contends that the implementation of the policy was in bad faith.  According to her, the reporting and investigation processes were "ham-fisted," took a "blame-the-victim" attitude, was a "meaningless sham," and the MAA management has "an ongoing illegal pattern and practice of discriminating against individuals who file credible threats of discrimination against the Airport."[12]

Yet, her complaint itself reflects that twice, the MAA's investigation mechanism resulted in the prompt termination of the two supervisors who had allegedly sexually harassed her. See Compl. ¶ 22 ("Although it did not find that Mr. Sheehan had sexually harassed Ms. Butler, the Airport terminated Mr. Sheehan's employment."); Compl. ¶ 67 ("MAA completed its investigation and determined that Mr. Samuels should be terminated for 'inappropriate, unprofessional behavior, and poor judgment'").

---

[12]    See Compl. ¶¶ 13, 30, 31, 69, 70.

As noted by the Supreme Court in <u>Twombly</u>, 550 U.S. at 555, "labels and conclusions . . . will not do" to satisfy a plaintiff's obligation to provide the grounds of her entitlement to relief in her complaint.  Butler's claims that the MAA's complaint procedure was part of a pattern of discrimination and was a sham do not provide sufficient factual allegations to "raise [her] right to relief above the speculative level."  <u>Id.</u>

Instead, Butler's complaint reflects that the MAA took prompt and effective remedial action to correct the harassment upon learning of it, <u>see</u> <u>Spicer</u>, 66 F.3d at 711, and the MAA's remedial action was enough to "effectively stop the harassment" by her supervisors, <u>Xerxes</u>, 639 F.3d at 670.[13]  As the Fourth

---

[13]    The Court notes that the only racial or sexual harassment alleged in the complaint that occurred chronologically after the termination of Samuels was the fact that when Butler returned to work on or about June 2009, "she heard rumors that people called her 'the Black Widow.'"  Compl. ¶ 81.  A "black widow" is "an American spider, <u>Lactrodectus mactans</u>, the female of which is black with red markings, highly venomous, and commonly eats its mate."  Collins English Dictionary (10th ed. HarperCollins 2009).  Butler argues that this name-calling had a racial double meaning.  <u>See</u> Opp'n 15.

   Because the rumored name-calling by co-workers is distinct from the alleged abuse by Samuels that was investigated and corrected by the MAA through his termination, this does not contradict that the MAA corrected the harassment.

    A different legal standard applies to claims of co-worker, rather than supervisor harassment.  "In a case where an employee is sexually harassed by a coworker, on the other hand, the employer may be liable only 'if it knew or should have known about the harassment and failed to take effective action to stop it.'"  <u>Howard v. Winter</u>, 446 F.3d 559, 565 (4th Cir. 2006) (quoting <u>Ocheltree v. Scollon Productions, Inc.</u>, 335 F.3d 325,

Circuit has noted, "Plaintiffs often feel that their employer 'could have done more to remedy the adverse effects of the employee's conduct.  But Title VII requires only that the employer take steps reasonably likely to stop the harassment.'" Xerxes, 639 F.3d at 674 (citation omitted).

Because Butler's complaint alleges that the MAA's investigations stopped the harassing conduct, the first element of the Faragher/Ellerth affirmative defense is undisputable.

The second prong of the affirmative defense is "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765.  "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer,

---

334 (4th Cir. 2003)).  As noted by the Supreme Court, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Faragher, 524 U.S. at 787-88.
    Butler has not alleged that the MAA knew or should have known that, after Samuels' termination and Butler's return to the workplace, employees were engaging in name-calling with a potentially racial double-meaning.  Butler does not allege that she reported it.  She also does not allege that the rumors were severe or pervasive enough to alter the terms or conditions of her employment.  As such, she does not plausibly state a claim for racial discrimination based on the rumored name-calling that took place after her return to the workplace.

a demonstration of such failure will normally suffice to satisfy

the employer's burden under the second element of the defense."

Faragher, 524 U.S. at 807-08; Ellerth, 524 U.S. at 765.

The Fourth Circuit, in Barrett v. Applied Radiant Energy

Corporation, 240 F.3d 262 (4th Cir. 2001), has discussed this

prong of the affirmative defense in depth:

> "[T]he law against sexual harassment is not
> self-enforcing and an employer cannot be
> expected to correct harassment unless the
> employee makes a concerted effort to inform
> the employer that a problem exists."  An
> employee's subjective belief in the futility
> of reporting a harasser's behavior is not a
> reasonable basis for failing to take
> advantage of any preventive or corrective
> opportunities provided by the employer.
>
> We acknowledge that discussing such matters
> as sexual harassment with company managers
> often puts the harassed employee in an
> awkward and uncomfortable situation.
> Nevertheless, this "inevitable
> unpleasantness" cannot excuse an employee
> from taking advantage of her employer's
> complaint procedure.  Little can be done to
> correct this objectionable behavior unless
> the victim first blows the whistle on it.
> "[A]n employee's subjective fears of
> confrontation, unpleasantness or retaliation
> thus do not alleviate the employee's duty
> under Ellerth to alert the employer to the
> allegedly hostile environment."  Allowing
> subjective fears to vitiate an employee's
> reporting requirement would completely
> undermine Title VII's basic policy "of
> encouraging forethought by employers and
> saving action by objecting employees."
> Faragher, 524 U.S. at 807; Ellerth, 524 U.S.
> at 764 (emphasis added).

Id. at 268-69 (some internal citations omitted).

Samuels' sexual harassment continued for a year after
Butler asked for a transfer but intentionally failed to reveal
the sexual harassment.  Butler alleges that she "did not wish to
raise a major issue with respect to Mr. Samuels' behavior" with
the MAA management, "[g]iven her legitimate concerns about
retaliation from the Airport's senior management."  Compl. ¶ 34.
Thus, Butler alleges that she "remained under the supervision of
Mr. Samuels for over a year" from the time that the alleged
harassment began.  Compl. ¶ 36.  Butler also alleges that she
did not file a harassment complaint against Samuels because she
wanted to be "discreet[]," Compl. ¶ 45, and because she believed
the investigation and resolution process to be ineffective.

As discussed by the Barrett court, an employee's subjective
fears of confrontation, unpleasantness, or retaliation do not
alleviate the employee's duty under Ellerth to alert the
employer to the allegedly hostile environment, as a matter of
law.  See 240 F.3d at 268-69.  Because Butler's complaint itself
reflects that Butler unreasonably failed to take advantage of
the MAA's complaint and investigation opportunities, her
complaint satisfies the second prong of the Faragher/Ellerth
affirmative defense.

The Court thus finds that the MAA cannot, as a matter of
law, be held vicariously liable with regard to Butler's claim of

hostile work environment caused by Sheehan's and Samuels' inappropriate conduct.

Butler also claims that the MAA created a hostile work environment after Sheehan's and Samuels' sexual harassment ceased.  Butler claims that, even after both Sheehan and Samuels had been terminated by the MAA, the MAA employees and managers involved with the internal investigations "continued to act in a hostile manner" towards Butler.  Opp'n 18.  However, Butler's complaint is devoid of factual allegations sufficient to present a plausible claim that the MAA management created the sort of "sexually objectionable" hostile environment that Title VII forbids.  See Faragher, 524 U.S. at 788.  Butler's complaint alleges that the MAA's senior management "was extremely hostile towards Ms. Butler during the meeting" and took a "'blame the victim for the conduct'" attitude, that the tension among her coworkers was "palpable," and that there were "rumors that people called her "'the Black Widow.'"  Compl. ¶¶ 69, 70, 81.  Butler felt that the MAA management had no desire to help her recover or right any wrong, and H.R. Director Ladzinski improperly inserted herself into the medical review process.  Compl. ¶¶ 83, 93.

Despite Butler's label that the MAA management's conduct was "hostile" in the colloquial sense, Butler has not alleged facts to support a plausible that the behavior of MAA management

in the 15 months after Samuels' termination and before her own was racially or "sexually objectionable." Faragher, 524 U.S. at 788.  The only allegation having even an arguable sexual or racial component is the rumor that she was called "the Black Widow" by coworkers, and Butler does not allege that she ever notified the MAA of this name-calling by unnamed coworkers.

As the Supreme Court noted in Faragher, the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'  Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace.'"  Id.; see also Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 269 (4th Cir. 2001) (noting that employer's response to post-investigation, "ostracism and vilification" of the employee by other co-workers was "bereft of a sexual component" and did not constitute sexual harassment).

In sum Butler has not presented factual allegations adequate to present a plausible claim in Count One.[14]

---

[14]   Because the Court concludes that Butler does not plausibly state a claim for relief on Count One, it does not reach the MAA's argument that Butler's race-based harassment claims should be barred because her administrative charge of discrimination focused on the sexual nature of the alleged discrimination and thus did not provide adequate notice to the MAA that there was a racial aspect to the charges as well.

B.   <u>Title VII Retaliation Claim (Count Two)</u>

In regard to retaliation, Title VII provides in pertinent

part:

> It shall be an unlawful employment practice
> for an employer to discriminate against any
> of his employees * * * because he has made a
> charge [under Title VII].

 42 U.S.C. § 2000e-2(a)(3).

The statute permits "a person claiming to be aggrieved" to

file a charge with the EEOC alleging that the employer committed

an unlawful employment practice, and, if the EEOC declines to

sue the employer, it permits a civil action to "be brought ...

by the person claiming to be aggrieved . . . by the alleged

unlawful employment practice." § 2000e-5(b), (f)(1).

In <u>Thompson v. North American Stainless, LP</u>, 131 S. Ct. 863

(2011), the Court stated that the reach of the retaliation cause

of action is somewhat broader than that of Title VII's

substantive provisions:

> Title VII's antiretaliation provision
> prohibits an employer from
> "'discriminat[ing] against any of his
> employees'" for engaging in protected
> conduct, without specifying the employer
> acts that are prohibited.  <u>Burlington N. &
> S.F.R. Co. v. White</u>, 548 U.S. 53, 62
> (quoting § 2000e-3(a) (emphasis deleted)).
> Based on this textual distinction and our
> understanding of the antiretaliation
> provision's purpose, we held that "the
> antiretaliation provision, unlike the
> substantive provision, is not limited to
> discriminatory actions that affect the terms

and conditions of employment." <u>Id.</u> at 64.
Rather, Title VII's antiretaliation
provision prohibits any employer action that
"well might have dissuaded a reasonable
worker from making or supporting a charge of
discrimination." <u>Id.</u> at 68 (internal
quotation marks omitted).

<u>Id.</u> at 868.  Thus, the discriminatory conduct prohibited by the

retaliation provision is not limited to "ultimate employment

decisions." <u>Burlington N. & S.F.R. Co. v. White</u>, 548 U.S. 53,

67 (2006).

"The antiretaliation provision protects an individual not

from all retaliation, but from retaliation that produces an

injury or harm." <u>Id.</u>  "[A] plaintiff must show that a

reasonable employee would have found the challenged action

materially adverse, which in this context means it well might

have dissuaded a reasonable worker from making or supporting a

charge of discrimination." <u>Id.</u> at 68 (internal quotation marks

omitted).  This standard is an objective one, and does not take

into account "a plaintiff's unusual subjective feelings." <u>Id.</u>

at 68-69.

The retaliation claim does not turn on "'the nature of the

discrimination that led to the filing of the charge,'" but is

"tied to the challenged retaliatory act, not the underlying

conduct that forms the basis of the Title VII complaint." <u>Id.</u>

This is because, "[b]y focusing on the materiality of the

challenged action and the perspective of a reasonable person in

the plaintiff's position, we believe this standard will screen
out trivial conduct while effectively capturing those acts that
are likely to dissuade employees from complaining or assisting
in complaints about discrimination."

To establish her retaliation claim, Butler must prove

1.  She engaged in protected activity;

2.  The MAA has taken an action against her that a
    reasonable employee would have found materially
    adverse; and

3.  That action had a causal connection to the
    protected activity.

See U.S. E.E.O.C. v. Lockheed Martin Corp., 444 F. Supp. 2d 414,
418 (D. Md. 2006) (citing White, 548 U.S. at 68); see also
Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).


1.  Protected Activity

"[A]n employee's complaint constitutes protected activity
when the employer understood, or should have understood, that
the plaintiff was opposing discriminatory conduct."   Burgess v.
Bowen, 466 F. App'x 272, 282 (4th Cir. 2012).

To satisfy the first element, Butler has alleged that she

1.  Reported the allegedly harassing conduct of Sheehan,
    her first supervisor, to the Airport's Fair Practices
    officer in August 2007;

2.  Complained of Samuels' conduct in March 2009, which
    initiated a workplace violence investigation; and

3.     In April 2009 she submitted a formal charge of
       discrimination to the Maryland Commission on Human
       Relations.

Although the MAA argues that only the submission of the

formal complaint in April 2009 would be protected activity, for

dismissal purposes, the Court finds that Butler has alleged

facts establishing a plausible claim that her internal

complaints against Sheehan and Samuels would constitute

protected activity.


2.     Materially Adverse Retaliatory Action

Butler alleges that the MAA took the following retaliatory

actions against her:

1.     The MAA conducted its two investigations in bad faith,
       with a "blame the victim" attitude, and generally
       acted in a callous, hostile, and intimidating manner;

2.     Samuels' harassing conduct was itself retaliatory,
       because he confirmed Butler's suspicious that the MAA
       management wanted to retaliate against her, and preyed
       on her insecurities;

3.     The MAA refused Butler's requests to quietly resolve
       her complaint against Samuels through a transfer;

4.     The MAA placed Butler on Administrative Leave while it
       conducted its investigation;

5.     The MAA conducted the investigation in such a way that
       it poisoned the work atmosphere against Butler,
       causing her to experience major bouts of depression;

6.     The MAA failed to grant Butler a transfer to a
       different division;

7.    The MAA attempted improperly to influence the decision
      of State Medical Examiner Toney.

8.    The MAA ultimately terminated Butler's employment in
      October 2010.

Certainly, Butler cannot maintain a viable retaliation claim based on each and every one of listed contentions.[15] However, the latter one, the termination of her employment, is a materially adverse employment action.

### 3.   Causation

The crux of Butler's retaliation claim is that the MAA's "blame the victim" investigation caused her emotional distress, causing her to be unable to perform her job functions resulting in the termination of her employment.

The MAA argues that Butler's termination, which took place more than 15 months after the investigations ended with Samuels' termination, was not close enough in time to infer that it was caused by her protected activity.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (holding that the

---

[15]   For example, it is not plausible to base a retaliation claim on Samuels' conduct.  Under the statutory structure, the "underlying conduct that forms the basis of the Title VII complaint" is distinct from the "retaliatory act."  See White, 548 U.S. at 68-69.  Moreover, the retaliation provisions of Title VII protect an employee from retaliatory acts by the employer.  42 U.S.C. § 2000e-3(a); Thompson, 131 S. Ct. at 868. As discussed above, Samuels' conduct cannot be considered that of the employer.

temporal proximity must be "very close" and that an action taken 20 months after a protected activity suggests, by itself, no causality at all).  But this position ignores Butler's factual allegation that the act of the MAA's ongoing animosity towards her caused her depression, which led to the termination.

Therefore, Butler has adequately alleged the third element of her retaliation claim.


        4.   <u>Legitimate Reason for Discharge</u>

The MAA contends that it cannot be held liable for Butler's ultimate termination because it had a legitimate nondiscriminatory reason for her termination, <u>i.e.</u> that she was not adequately performing her job.  However, Butler contends that it was the MAA's retaliatory actions that caused her inability to perform her duties adequately.  Of course, when the pertinent record before the Court includes more than the allegations in the Complaint, the MAA may well have a valid defense.  However, the retaliation claim is not subject to dismissal if, as it must, the Court assumes the truth of the factual assertions in the Complaint.


   C.   <u>Count Three - Maryland Fair Employment Practices Act</u>

The Maryland's state-law analogue to Title VII, Maryland's Fair Employment Practices Act ("FEPA"), Md. Code. Ann., State

Gov't § 20-601 et seq., prohibits substantive discrimination by employers, as well as retaliation against employees who have opposed discrimination or who have participated in any investigation or proceeding into discrimination.   Id. § 20-606.

This Court agrees with the decisions holding that FEPA is, essentially, a state counterpart of Title VII, neither adding to nor subtracting from a plaintiff's rights in any way material to the instant case.   "Title 20 of the Maryland State Government Article is essentially the state law analog to Title VII."   Barnes v. ISG Sparrows Point, LLC, 2011 WL 4596058, at *1 n.4 (D. Md. Sept. 30, 2011) (citing Haas v. Lockheed Martin Corp., 914 A.2d 735, 742 n.8 (Md. 2007)).   "Maryland courts routinely look to Title VII cases to determine the scope of liability under Title 20."   Bishop v. Bd. of Educ. of Calvert Co., 2011 WL 2651246, at *9 (D. Md. July 5, 2011).

Butler argues that FEPA is not coextensive with Title VII, because "FEPA actually provides additional and broader protections to Ms. Butler."   Opp'n 39.   This is so, according to Butler, because Governor Martin O'Malley has issued an Executive order entitled "Code of Fair Employment Practices" that applies to state employees.   See Md. Code Regs. 01.01.2007.16 (2007). According to Butler, this Executive Order imposes an "underlying 'fairness' requirement."   Opp'n 39.   Butler argues that "the Complaint demonstrates that the Agency clearly has not followed

28

a 'zero tolerance'[16] policy with respect to employment discrimination.  If it had, Ms. Butler would not have been subjected to years of improper conduct by her supervisors." Opp'n 40.  Also, "the Agency has not implemented the Governor's requirements that the Agency promptly investigate and resolve complaints[17] . . . . the Agency's investigations in this case were a sham that actually exacerbated the mental and emotional trauma suffered by Ms. Butler."  Id.  Finally, "the Complaint demonstrates that the Agency's conduct towards Ms. Butler was completely unfair."  Id.

However, there appear to be no published cases interpreting whether Executive order 01.01.2007.16 expands protection to state employees for all employer conduct that could be considered "unfair" in the broad sense.  Moreover, the Court concludes that, based on the language and structure of the Executive Order, such an interpretation is not reasonable and would create an absurd result.

---

[16]   "Cabinet officials and other heads of departments or units are expected to lead by example in promoting fair employment practices and this Administration's policy of zero tolerance for employment discrimination."  Md. Code Regs. 01.01.2007.16. Art. I(H).
[17]   "It is the policy of this Administration that all complaints of discrimination or other unfair employment practices be thoroughly investigated and promptly resolved, as appropriate."  Md. Code Regs. 01.01.2007.16. Art. II(A).

Article I of Executive Order 01.01.2007.16 sets forth, in parts A through E, the unfair employment practices that are prohibited by the "Equal Employment Opportunity Program in State Government."[18]  These sections, together, provide broader

---

[18]    In relevant part:

A. All personnel actions concerning any employee or applicant for employment in the Executive Branch will be taken on the basis of merit and fitness, and without regard to:

    (1) Age;
    (2) Ancestry;
    (3) Color;
    (4) Creed;
    (5) Gender identity and expression;
    (6) Genetic information;
    (7) Marital status;
    (8) Mental or physical disability;
    (9) National origin;
    (10) Race;
    (11) Religious affiliation, belief or opinion;
    (12) Sex; or
    (13) Sexual orientation.

B. All personnel actions concerning any skilled, professional or management service employee and any special appointee designated by the Secretary of Budget and Management, or any applicant for employment in those services or in comparable positions in an independent personnel system in the Executive Branch, shall be without regard to political affiliation, belief or opinion.

C. Discrimination against or harassment of employees on the basis of any reason prohibited by law is not permitted.

D. Retaliation against any employee who opposes discrimination or participates in an EEO investigation is not permitted.

protections for state employees than do FEPA and Title VII,[19] but cannot plausibly be interpreted to extend protection to any employer conduct considered "unfair" in the colloquial sense.

Because Executive Order 01.01.2007.16 does not broaden the protections provided by FEPA as they relate to this case, and because FEPA is otherwise coextensive with Title VII as it relates to sexual harassment and racial discrimination, the Court concludes that Count Three shall be dismissed as it relates to Butler's hostile environment harassment claim, but survives dismissal as it relates to her retaliation claim.


D.   Timeliness

The Court is dismissing Count One, rendering moot the timeliness issues as to that Count.  The Court is not certain of the precise timeliness issues, if any, the MAA is presenting with regard to regard to Count Two, particularly in light of the

---

E. Retaliation against an individual because of their refusal to submit to a genetic test or make available the results of a genetic test is not permitted.

Md. Code Regs. 01.01.2007.16. Art. I(A)-(E).
[19]   For example, Title VII does not provide protection for discrimination on the basis of sexual orientation, see 42 U.S.C. § 2000e-2, however, FEPA does, see Md. Code. Ann., State Gov't § 20-606.  The Executive order further extends that protection to "Gender identity and expression," and also requires personnel actions to be taken on the basis of "merit and fitness."  Md. Code Regs. 01.01.2007.16. Art. I(A).

two-year period of limitations provided by FEPA.  Therefore, the denial of dismissal of Count Two is without prejudice to the MAA's right to file a motion seeking dismissal that clearly presents a timeliness contention.

     E.   <u>Sovereign Immunity</u>

The Court is dismissing Count One, rendering moot the sovereign immunity issue as to that Count. The Court is not certain of the damages that Butler is seeking in regard to Count Two or if the MAA is presenting a sovereign immunity defense as to any aspect of the Count.

Under the circumstances, the case shall proceed on Count Two, the MAA may utilize discovery to ascertain what damages claims are being made by Butler and may assert any defense, including sovereign immunity that may be pertinent to Butler's damage claims.

IV.   <u>CONCLUSION</u>

For the foregoing reasons:

1.   Defendant Maryland Aviation Administration's Motion to Dismiss Plaintiff's Complaint, or in the Alternative, for Summary Judgment [Document 19] is GRANTED IN PART.

2.   All claims in Count One are dismissed.

3.   All claims in Count Three based upon claims in Count One are dismissed.

4.   Count Two and claims in Count Three based on Count Two remain pending.

5.   Plaintiff shall arrange a case planning telephone conference to be held by August 31, 2012.


SO ORDERED, this <u>Tuesday, August 14, 2012</u>.


_____/s/_____
Marvin J. Garbis
United States District Judge